## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

LOUIS FILIBA
1778 Willard Street., N.W., Suite 1.
Washington, D.C. 20009

      Plaintiff,

 v.

COCHRANE USA, INC.,
1012 14th Street., N.W. Suite 1400
Washington, D.C., 20005,

COCHRANE INDUSTRIES, LTD.
125 Fitter Rd,
Spartan, Kempton Park
1619 South Africa.

 and

ALEXANDER COCHRANE
1012 14th Street., N.W. Suite 1400
Washington, D.C., 20005.,

      Defendants.

Civil Action No. __-_____(    )


**JURY TRIAL DEMANDED**


## COMPLAINT

Plaintiff LOUIS FILIBA, by and though his undersigned counsel, file this Complaint against Defendants, states and alleges as follows:

## INTRODUCTION

Plaintiff LOUIS FILIBA brings this action against Defendants COCHRANE USA INC., COCHRANE INDUSTRIES, LTD., and ALEXANDER COCHRANE seeking monetary relief for discriminatory practices against Plaintiff based on Plaintiff's national origin

and his religion in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §

2000e, et. seq. ("Title VII"), and the Human Rights Act of the District of Columbia, D.C. Code

Ann §§ 2-1401.01 et seq.

This case is an egregious example of employer perversion of the H-1B visa program, a

program that ties workers' immigration status to a single employer, can be horribly abused by an

unscrupulous employer resulting in overt and shocking discrimination against a vulnerable and

defenseless non-citizen employee.

The man who was abused at the hands of his unethical employer is Plaintiff, Louis Filiba, a

Jewish person who is a citizen of South Africa and Israel. The abusers are the Defendants in this case,

a foreign corporation and its wholly-owned U.S. subsidiary.  From 2010 until November 2017, Mr.

Filiba worked for the Defendants in the United States under an H-1B visa sponsored by Cochrane

USA.  Mr. Filiba worked for Defendant Cochrane USA first in marketing, and later as a salesman

and then as a sales manager.  During most of this time, Plaintiff was one of Cochrane USA's top

producers. Despite his hard work and his success, Mr. Filiba, and Cochrane USA's other non-citizen

employees were and have been continually and callously discriminated against by the Defendants.

Defendants did this because they could.  Job loss meant visa loss and possible deportation.

Despite this risk, Mr. Filiba finally complained to Alexander (AKA "Lex") Cochrane, his

supervisor and the Chief Executive Officer of Cochrane Industries, after he was injured on the job.

Defendants refused to reimburse him for his medical expenses.  Instead, Defendants "upped their

game" and embarked on a campaign to terrorize Plaintiff because of his national origin and his

religious beliefs.  In the end, Plaintiff was forced to either adopt "the Cochrane style", which included

forsaking his religious beliefs and "accepting Jesus Christ as his Savior," or resigning.  Plaintiff was

constructively discharged on November 9, 2017.

From 2010 until November, 2017, Defendants denied Plaintiff significant benefits enjoyed by Cochrane's American employees. For example, unlike his American counterparts, Plaintiff was never given an employment contract; he received few wage increases, even when "promoted", he was only given title changes; he received only one small wage increase during the last four (4) years of his employment; he never received health insurance; he was denied paid leave, denied US National Holidays because Defendants stated he was not entitled to them as a non-citizen; he was ordered not to file a Worker's Compensation claim, and he was not offered retirement benefits. Unlike his similarly situated American counterparts, he was never provided use of a company-owned vehicle.  Finally, when Plaintiff made inroads into an entirely new industry, the U.S. utility industry, and made approximately $15 Million in sales, Defendants transferred the entire industry to a salesman, who is an American citizen, telling Plaintiff that it was better for an American to handle these projects and accounts. Plaintiff was not the only target of this disparate treatment. In fact, Defendants took advantage of virtually every one of their non-American citizen employees in a similar manner.

In an effort to free himself from his H-1B servitude, Plaintiff begged Defendants to sponsor him for a Green Card, and, for a short period of time, it appeared that Defendants were willing to do so as they made a Green Card application for Plaintiff twice.  The first was rejected because Defendants filed it improperly, and the second was rejected because Defendants were woefully underpaying Plaintiff.  Upon learning that Plaintiff's second Green Card application had been stalled in early July, 2017, soon after the 4th of July celebrations, Lex Cochrane laughed and ridiculed Plaintiff, and in a moment of derisive candor, he stated the following to his longtime employee: "Despite America's July 4th Independence Day celebrations, you still don't have any independence."

In September, 2017, the Department of Labor ("DOL") ultimately denied Plaintiff's employer sponsored Green Card application on the grounds that Defendants were underpaying Plaintiff by a massive 150% under the prevailing wages set by the DOL, and despite the fact that

Plaintiff requested a copy of the DOL's determination letter, Defendants refused to provide him with a copy.

Prior to his Green Card rejection, Defendants began a campaign to harass and terrorize Plaintiff.  The event that precipitated this campaign was a workplace injury.  Plaintiff was injured while on the job at Plaintiff's warehouse facilities in Lorton, Virginia.  Because the company did not provide Plaintiff with health insurance or a car allowance and because he had become incapacitated and unable to drive or perform physical labor until he had received the necessary treatment and therapy, Plaintiff sought help from the Defendants and asked them to pay for his medical bills and to assist him with his car payments, as similarly situated American citizen employees were afforded both health insurance and car allowances or company vehicles.  Lex Cochrane cursed at Plaintiff, scolded him and threatened to terminate him, before summarily denying Plaintiff's request.

As a result, Plaintiff filed a Worker's Compensation claim, something Defendants' American citizen employees do without prejudice to their careers and without endangering their job security.  Once again, Plaintiff was treated differently than his U.S. counterparts.  Instead of encouraging Plaintiff to file a claim and receive payments covering his medical expenses and treatments for his partially torn rotator cuff and damaged discs in his neck, Lex Cochrane ordered him to drop the claim.   Because Plaintiff refused to drop his Worker's Compensation claim, the Cochrane Defendants began a vicious campaign of discriminatory conduct against Mr. Filiba starting in August of 2016..  Defendants outrageously harassed, attacked and abused Plaintiff to such an extent that it ultimately prevented Plaintiff from performing his job duties.   To say that Defendants created a hostile work environment is an understatement.

Defendants' 2017 assault on Plaintiff included deleting his user profile on his work laptop, which prevented Plaintiff from accessing his work papers and his company email.  Defendants

hacked Plaintiff's personal cell phone deleting its contents, and they surreptitiously installed a GPS transmitter on his phone to track Plaintiff's movements before, during and after work hours.  This assault also included outrageous acts of overt religious discrimination.  Lex Cochrane, and his brother, Douglas, a company officer and director, demanded that Plaintiff and other non-Christian employees attend Christian churches with them; they made Plaintiff read passages from the New Testament "proving" that the Jews' killed Jesus in front of other employees, and they constantly ridiculed Plaintiff's religious beliefs in the workplace and while on company business.

In November, 2017, Defendants' campaign of harassment and intimidation culminated in Defendant Lex Cochrane ordering Plaintiff to Defendant Cochrane Industries' headquarters in South Africa where Cochrane's agents kidnapped and held Plaintiff against his will, threatened and extorted him.  On November 9, 2017, Plaintiff felt coerced and compelled to formally tender his resignation, which was accepted by Lex Cochrane at Defendant Cochrane Industries' headquarters in Johannesburg, South Africa.  Plaintiff was constructively discharged as he could no longer accept Defendants' rampant, overt and vicious discriminatory actions targeting him. No one could be expected to withstand this abuse.

## I.  <u>NATURE OF THE ACTION</u>

1.    Plaintiff  LOUIS FILIBA brings this action against Defendants COCHRANE USA INC., COCHRANE INDUSTRIES, LTD., and ALEXANDER COCHRANE seeking monetary relief for discriminatory practices against Plaintiff based on Plaintiff's national origin and religion in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983,  ("§1983"); Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e, et. seq. ("Title VII"), and the District of Columbia Human Rights Act, D.C. Code Ann §§ 2-1401.01 *et seq.* (DCHRA).

## <u>JURISDICTION AND VENUE</u>

2.    This Court has subject matter jurisdiction over Plaintiff's federal claims under

Title VII, pursuant to 28 U.S.C. §1331. An express grant of federal court jurisdiction over these federal claims is found in Title VII at 42 U.S.C. §2000e-5(f)(3), 29 U.S.C. §626. Further, this Court has jurisdiction over Plaintiff's claim under the DCHRA state claim, pursuant to 28 U.S.C. §1367.

3.      This Court has personal jurisdiction over Defendants, COCHRANE USA, COCHRANE INDUSTRIES, LTD and ALEXANDER COCHRANE as well.  COCHRANE USA is headquartered in the District of Columbia and conducts business in this district; COCHRANE INDUSTRIES, LTD. is a 100% owner of COCHRANE USA, INC. and it exerts complete control over COCHRANE USA's business and financial affairs and all of its personnel decisions and policies.  ALEXANDER COCHRANE is Plaintiff's direct supervisor. He regularly conducts business in the District of Columbia and he controls both of the COCHRANE corporate entities.

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because many of the acts and omissions giving rise to Plaintiff's claim occurred in the District of Columbia. Plaintiff was employed in the District of Columbia, Defendant COCHRANE USA INC., is headquartered in the District of Columbia, and many of the unlawful acts and omission giving rise to these claims took place in the District of Columbia.

## II.     PARTIES

5.      Plaintiff Louis Filiba is a resident of the District of Columbia.  He is Jewish and he is a citizen of Israel and South Africa.

6.      Plaintiff started working for the Cochrane Defendants in 2005. He was hired by Defendant Cochrane USA Inc. in January, 2010, and he worked for the Cochrane Defendants until his constructive discharge on November 9, 2017.

7.     Defendant Cochrane USA Inc. is a Delaware corporation, wholly owned by Cochrane Industries Ltd., a UK company headquartered in Johannesburg, South Africa that manufactures and sells fencing products.

8.     Cochrane Industries, Ltd, is a global company employing more than 500 people.

9.     Cochrane USA sells fencing products in the United States; it is headquartered in the District of Columbia and does business in the District of Columbia; at all times relevant hereto, it also had warehouses in Lorton, Virginia and manufacturing facilities located in Fredericksburg, Virginia.

10.     Cochrane USA employs many more than fifteen (15) employees. It engages in commerce in the United States, and it has sales' revenues that far exceed $500,000.

11.     Defendants Cochrane Industries, Ltd., and Cochrane USA, Inc. are "integrated enterprises" for the purposes of Title VII.  As such, they are together and individually considered Plaintiff's employer.

12.     Defendant Cochrane Industries, Ltd. owns and controls Defendant Cochrane USA, Inc., including its employment-related decisions regarding hiring and terminations as well as all of its employment-related policies.  Moreover, Cochrane Industries exerts both management and financial control over Cochrane USA.  *See Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 391 (8th Cir. 1977), was the first case to apply the four-factor test to the EEO statutes. The test has subsequently been widely adopted. *E.g.*, *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1342 (11th Cir. 1999) (en banc); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995); *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 450 (5th Cir. 1994).

III.     <u>FACTUAL BACKGROUND</u>

7

13.     Plaintiff worked for Defendant Cochrane USA in marketing, as a Salesman, and later as a Sales Manager from January 2010 through November 9, 2017.

14.     Throughout the term of his employment, Plaintiff worked in the United States under an H-1B visa secured for him by the Defendants. As such, his immigration status in the United States was completely dependent upon his continued employment with the Defendants.

15.     Defendants took advantage of the fact that Plaintiff was dependent upon them to stay in this country partially because they knew he had a long-term relationship with an American girlfriend and knew that he did not want to leave the country.

16.     On several occasions, Defendants demanded and coerced Plaintiff into signing bank documents and other documents pertaining to shell companies without explaining their import or their purpose. Defendants even coerced Plaintiff into using his own credit to enter into cell phone contracts for every employee in the company ultimately resulting in harming his credit because of late payments by Defendants.

17.     Despite providing similarly situated American employees with Health Insurance, Workers' Compensation benefits, wage increases, paid vacations and other benefits, and company owned vehicles. Defendants refused to provide Plaintiff with such benefits.

18.     In January 2016, Mr. Filiba was seriously injured while working at Defendants' warehouse facilities located in Lorton, Virginia. He incurred significant medical expenses as a result of his injuries and his injuries prevented him from traveling for a period of time, thus affecting his ability to effectively perform many of his duties.

19.     Because Plaintiff was not an American citizen, Plaintiff was not afforded health insurance or an automobile by Defendants, so Plaintiff requested Defendants' financial assistance with his medical expenses associated with his work-related injuries and with his car payment covering the period of time in which he was incapacitated. Lex Cochrane summarily refused

8

Plaintiff's requests, and accused him of lying.  He even went so far as to demand that another employee write a document stating the Plaintiff was injured playing soccer.  This fellow employee wrote a few draft documents for Mr. Cochrane, but Mr. Cochrane found them unacceptable, as they apparently did not state the "facts" as he wanted them presented. Because this fellow employee, also a foreign worker, refused to lie about the manner in which Plaintiff was injured, Defendant Lex Cochrane fired this employee. Despite all Lex Cochrane's coercion and threats, Plaintiff ultimately filed a claim for Worker's Compensation in or around May of 2016.

20.     In response, Lex Cochrane ordered Plaintiff to withdraw his Workers' Compensation claim.  At this time, Defendants' veiled threats were effective and Plaintiff delayed his case hoping his injuries would heal and deciding to simply pay the bills himself, but, unfortunately, they did not heal and he could not afford the bills, which were approximately $10,000.

21.     On or around May, 2017, Plaintiff decided he had to pursue his claim. Soon thereafter, Defendants informed Plaintiff that their carrier, Hartford, dropped them and they blamed this on Plaintiff.  Despite this, Plaintiff asked Defendants for financial assistance to cover his medical bills.  Defendant Lex Cochrane responded by calling Plaintiff on the telephone, calling him a liar and blaming him for the fact that they would now have to pay more for insurance.

22.     In addition, Defendants immediately began victimizing Plaintiff by unlawfully hacking and deleting the contents of his private cell phone using a hacking application called "Cochrane+".

23.     On September 6, 2017, an Apple representative verbally confirmed that Cochrane+ had been used to hack and delete all of the data from Plaintiff's cell phone.

24.     Defendants also used Cochrane+ to unlawfully track Plaintiff's every movement - before, during and after work hours – using a GPS device that they surreptitiously planted on

Plaintiff's personal cell phone without his knowledge or consent.

25.    Defendants did not hack the cell phones of their U.S. employees, nor did they track them using GPS devices without their consent.

26.    On September 6, 2017, Defendants continued their assault on Plaintiff by maliciously deleting his user profile on his work laptop preventing him from accessing his work email or the company server thus preventing Plaintiff from effectively performing his duties.

27.    Defendants refused to restore Plaintiff's email and computer profile for several weeks despite Plaintiff's repeated requests.

28.     In September 2017, Plaintiff was informed by Lex Cochrane, that the U. S. Department of Labor (USDOL) had held up his employment-based Green Card application because Defendants were underpaying Plaintiff by a whopping 150%. Defendant Lex Cochrane laughed when he found this out and ridiculed Plaintiff in the presence of Plaintiff's mother stating that this would prevent Plaintiff from obtaining his independence from Defendants.

29.    This was the second Green Card application filed for Plaintiff by Defendants.  The first application was inexplicably filed under the wrong category and denied as a result.

30.    The USDOL later provided Defendants, as Plaintiff's employer sponsor, with the official documentation relating to the USDOL's adjudication of Plaintiff's application, and Defendants refused to show Plaintiff the documents.

31.    Throughout Plaintiff's term of employment with Defendants, Defendant Lex Cochrane made it clear that he did not approve of Plaintiff's religion.  Requests for leave over the High Holidays went unanswered and once Lex Cochrane even ordered Plaintiff to attend a Trade Show in Germany during Yom Kippur, the holiest of the Jewish holidays.

32.    During the summer and the early fall of 2017, during business trips to New York and Connecticut respectively, Lex Cochrane and his brother Douglas Cochrane, an officer and director

of Cochrane Industries, Ltd., taunted and harassed Plaintiff for being Jewish by, among other things, repeatedly telling Plaintiff that "Jews were responsible for the murder of Jesus Christ" and informing Plaintiff that because he is "a Jew, he would never gain entry to the Kingdom of Heaven."

33.     In addition, Douglas and Lex Cochrane repeatedly assaulted Plaintiff by physically forcing a New Testament Bible into his hands and demanding that he read passages from the New Testament that they insisted supported their claim that "Jews were complicit in Jesus' murder, and Jews (such as Plaintiff) would not enter into Heaven unless they accepted Jesus as the Messiah."

34.     Defendants' above-mentioned assaults, harassment and taunting was witnessed by other Cochrane USA employees, who saw their conduct as an effort to harass and embarrass Plaintiff.

35.     In addition, Lex and Douglas Cochrane demanded and insisted that Plaintiff and other non-Christian, non-American employees attend Christian church services.

36.     In fear of losing his employment and his ability to remain in the United States, Plaintiff felt compelled to accompany Defendants to their Christian church services, where he was made to feel humiliated and embarrassed by Douglas and Alexander Cochranes' repeated comments deriding Plaintiff's religious beliefs during and after the church services.

37.     Despite the fact that Plaintiff knew he was being discriminated against because of his national origin and his religion, and despite suffering from the hostile and coercive work environment purposely and knowingly created by Defendants' most senior officers, Plaintiff was stuck working for Defendants because of his visa status. Plaintiff was at Defendants' mercy, a fact that Defendants openly acknowledged.

38.     On September 21, 2017, Plaintiff married his fiancée after dating her for three and half years and living with her for two years. Because his new wife is an American citizen, Defendants knew that Plaintiff would likely soon be able to obtain a non-employer based visa to stay in the

United States.

39.     Plaintiff requested leave for his honeymoon, which Lex Cochrane denied, and in November 2017, Lex Cochrane demanded that Plaintiff travel to Cochrane Industries Ltd.'s headquarters in South Africa.

40.     On or about November 6, 2017, when Plaintiff arrived in South Africa, Plaintiff received a notice from USCIS that he was required to appear at a biometrics processing center in the United States to obtain authorization for him to seek alternate employment in the United States.

41.     On or about November 8, 2017, Plaintiff notified Defendants that he would not participate in corporate meetings scheduled to occur in South Africa later that month, and that he would be returning to his home in the United States for his appearance at the designated USCIS biometrics facility for processing.

42.     On November 9, 2017, Defendant Alexander Cochrane summoned Plaintiff to a recorded, closed-door meeting during which he harassed Plaintiff for having requested leave for his wedding and honeymoon.  During this meeting, Cochrane also informed Plaintiff that he would not continue Plaintiff's employment if Mr. Filiba was simply seeking to be a good employee with a good relationship with Cochrane. Instead, he demanded that Plaintiff thoroughly and completely comply with Cochrane's "style" if he wished to work for Cochrane. This was perceived by Plaintiff as "code" for demanding that he stop practicing Judaism.  It was a demand not made to employees who were Christians or American citizens.

43.     Unable to tolerate this discriminatory treatment, further abuse, harassment and taunting over his religious beliefs and his heritage, Plaintiff tendered his resignation.  Lex Cochrane accepted his resignation and promised to provide Plaintiff with a severance package.

44.     The next day, on November 10, 2017, Lex Cochrane again summoned Plaintiff to his office in Johannesburg, South Africa.

45.     Upon arriving at Cochrane's office, Plaintiff was accosted by three armed and uniformed police officers, who forcibly took Plaintiff into custody and ordered him into a police vehicle, stating that they were going to "show him around town."

46.     Plaintiff felt severely intimidated and coerced into complying with their orders and was overcome by fear and confusion.

47.     When Plaintiff appealed to Lex Cochrane about this turn of events, Cochrane smiled and insisted that Plaintiff comply with the police officers.

48.     Coerced, intimidated and alone, Plaintiff reluctantly and against his will entered the back seat of a police vehicle.  The police officials drove Plaintiff to the dangerous slums of Kempton Park, Johannesburg approximately two miles from Cochrane's office.  When Plaintiff asked the police officials why they had driven him to this dangerous location, Police Captain Simon replied, "Mr. Cochrane wants us to show you where we can take the bad people."

49.     Terrorized and terrified, Plaintiff begged the officers to take him back to Cochrane's compound.  They refused, and instead drove Plaintiff to their Police Precinct.

50.     Upon arriving at the Precinct, Plaintiff continued pleading with the police officials to take him back to the Cochrane compound, but instead,  one of the officials pointed to a cell and told Plaintiff, "If Mr. Cochrane wants us to put you there, we will put you there with the bad people."

51.     Fearing for his safety, unable to leave and believing that he was about to be jailed, Plaintiff offered to take the police captain shopping at the nearby "Festival Mall"  promising to buy him a "birthday present."  Captain Simon agreed and also demanded that Plaintiff buy "birthday presents" for two of his fellow officers.

52.     Plaintiff was taken to the mall, where he was forced to purchase $600.00 worth of clothing and shoes for the officers.  Plaintiff used Defendants' credit card to make the purchase, and he retained a record of the transactions and his communications with Defendant Cochrane's

accounting department.

53.     After buying "presents" for the police officials, Plaintiff again pleaded with the officers to take him back to the Cochrane compound, and the officers finally granted Plaintiff's requests, returned him there and released him.

54.     Once back at the Defendants' compound, Plaintiff went to Lex Cochrane's office and asked why he had been forcibly kidnapped.  In response, Lex Cochrane grinned and stated in a threatening and intimidating tone, "It is easy to deceive someone, is it not?"

55.     Thereafter, Plaintiff left South Africa and returned home to the United States, intent on securing other employment as quickly as possible.

56.     In March 2018, during a recorded phone call with Police Captain Simon, Captain Simon confirmed that he and his fellow officers were acting under the direction of Alexander Cochrane when they kidnapped and falsely imprisoned Plaintiff.

## IV.     NOTICE OF RIGHT TO SUE

57.     On December 19, 2017, Plaintiff was interviewed by officials at the EEOC, and the EEOC thereafter filed a complaint against Defendant. *See* Exhibit No. 1.

58.     Because Defendants refused to pay Plaintiff owed compensation, Plaintiff also filed a complaint with the Government of the District of Columbia's Department of Employment Services seeking $13,474.02 in unpaid wages.

59.     On December 27, 2017, the Government of the District of Columbia's Department of Employment Services provided Plaintiff with a Formal Notice to pursue his claim. *See* Exhibit No. 2.

60.     On March 20, 2018, Plaintiff received an Official Right to Sue Notice from the Equal Employment Opportunity Commission (EEOC), Charge No. 570-2018-01586. *See* Exhibit No.3. (All allegations contained in these charges are hereby incorporated in this Complaint by reference.).

61.     This lawsuit has been commenced within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

## COUNT ONE
## RELIGIOUS DISCRIMINATION

62.     Plaintiff alleges each and every allegation contained in the previous paragraphs of this Complaint incorporates them herein, and further states and alleges as follows:

63.     Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals because of their religion (or lack of religious belief) in hiring, firing or any other terms and conditions of employment. In addition, where, as here, Defendants discriminated against Plaintiff because he was a foreign national and because he was Jewish, the Court need not assess each wrongful act for the purpose of determining which type of unlawful discrimination motivated their actions. S*ee Jeffers v. Thompson*, 264 F. Supp. 2d 314, 326 (D. Md. 2003); *see also Lam v. Univ. of Haw*., 40 F.3d 1551, 1562 ("[W]here two bases for discrimination exist, they cannot be neatly reduced to distinct components.").

64.     Title VII of the Civil Rights Act of 1964 also prohibits religious harassment of employees where it is unwelcome, and so pervasive or severe that it creates a hostile or offensive work environment or where there is a "quid pro quo harassment" where an employer harasses and coerces an employee to change their religious beliefs or to adopt certain religious beliefs in order to receive some job benefit.

65.     The Supreme Court has declared that the "quid pro quo" and "hostile work environment" labels are not controlling for purposes of establishing employer liability. But

the terms provide a basic demarcation for the kinds of harassment actions that are brought under Title VII. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 750 (1998) ("The terms 'quid pro quo' and 'hostile work environment' are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility. . . . The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive.") In this case we have both.

66.     An employer will also be liable for unlawful harassment if the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy." *Faragher v. City of Boca Raton***,** 524 U.S. 775, 789 (1998).  In such circumstances, the harasser's unlawful harassment is automatically imputed to the employer. *See also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (finding that under agency principles an employer is indirectly liable for the agent's conduct "where the agent's high rank in the company makes him or her employer's alter ego.").

67.     In this case, the person most culpable for Defendants' unlawful coercion and harassment is Lex Cochrane, Defendant Cochrane Industries' Chief Executive Officer, who controls both of the Defendant entities, and not some lowly employee, supervisor or agent of an otherwise responsible enterprise.  Thus, this Court will not have to determine whether the harasser's acts should be imputed to the Defendants.

68.     Defendant's discriminatory acts were willful and done with malice or reckless indifference to Plaintiff's federally protected rights.

## DISPARATE TREATMENT: RELIGION – QUID PRO QUO

69.     In November, 2017, Defendant Lex Cochrane informed Plaintiff Filiba that he would be fired if he would not adopt the Cochrane "style" and that being a good employee was not sufficient to remain employed by Defendants.

70.     Plaintiff Filiba reasonably understood Cochrane's demand to mean he would have to convert to Christianity in order to retain his job because the statement was made after many weeks of Defendants Lex and his brother Douglas Cochrane ridiculing Plaintiff's Jewish religion and insisting that Plaintiff renounce his religion, and convert to Christianity. This is exactly the quid pro quo that is prohibited by Title VII.

71.     The law does not require that the Plaintiff show that the Defendant implicitly or explicitly threatened retaliation.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 282 (3d Cir. 2000).  So long as Plaintiff shows "that his or her response to unwelcome advances was subsequently used as a basis for a[n] [adverse employment decision]. . ., the plaintiff need not show that submission was linked to compensation, etc. at or before the time when the advances occurred." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir. 1997), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  *See also* 29 C.F.R. § 1604.11(a)(2).  *See also Wilkerson v. New Media Tech. Charter School, Inc.*, 522 F.3d 315, 320  (3d Cir. 2008) (holding that the failure to renew an employment arrangement, "whether at-will or for a limited period of time, is an employment action, and an employer violates Title VII if it takes an adverse employment action for a reason prohibited by Title VII").

72.     Defendant's discriminatory acts were willful and done with malice or reckless indifference to Plaintiff's federally protected rights.

## DISPARATE TREATMENT: RELIGION – HOSTILE WORK ENVIRONMENT

73.     In September, 2017, in addition to suffering the above-described quid pro quo

religious discrimination, Defendants created a hostile work environment for non-Christians generally and for Jews like Defendant Filiba, more specifically.

74.     As described in numerous paragraphs above, on numerous occasion Lex and or Douglas Cochrane taunted, verbally abused and harassed Plaintiff, telling him that "Jews were responsible for the murder of Jesus Christ" and "because  he [Plaintiff] is a Jew, he would never gain entry to the Kingdom of Heaven".

75.     Further, also as described above and on more than one occasion, Douglas Cochrane, and Lex Cochrane, forcibly thrust a New Testament Bible into Plaintiff's hands and demanded that Plaintiff read passages from it to "prove" that the Jews murdered Jesus and were damned to Hell unless they accepted Jesus as the Messiah. This was done in front of other Cochrane employees.

76.     Additionally, when in the United States on business trips, Douglas Cochrane and Lex Cochrane demanded and insisted, by the use of implicit threats and coercion, that Plaintiff accompany them on Sunday mornings to attend Christian church services against his will and despite his unwillingness to do so.

77.     In fear of losing his employment and his work visa as a result, Plaintiff felt compelled to accompany Defendants to their Sunday morning Christian church services on several occasions, where Plaintiff was made to feel humiliated and embarrassed by the Cochranes when they made comments deriding Plaintiff's religious beliefs during and after the church services.

78.     Plaintiff even received a courier package via DHL originating from Cochrane's South African headquarters. The package was addressed to Plaintiff and delivered to Cochrane's Washington D.C. offices. Inside was a copy of a novel about Christian evangelists saving Jews in Nazi Germany. Accompanying this novel was a letter addressed to Plaintiff from Lex Cochrane instructing Plaintiff to read the novel for his edification.

79.     Defendant's abusive and harassing conduct was motivated by the fact that Plaintiff

was Jewish.

80.     Defendants' abusive and harassing conduct was pervasive, unwelcomed by Plaintiff and it took place frequently at Plaintiff's place of employment and elsewhere on work required excursions in the presence of other employees.  This conduct was both objectively and subjectively severe and outrageous.  *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (holding that Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'") (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-67 (1986)); *EEOC v. WC&M Enters.*, 496 F.3d 393, 400 (5th Cir. 2007) (finding that the EEOC presented sufficient evidence to create an issue of fact as to whether the employee was subjected to national origin harassment that was "so severe or pervasive as to alter a condition of his employment").

81.     As a result of Defendants' abusive and harassing conduct, Plaintiff experienced severe humiliation, embarrassment and emotional distress.

82.     Defendants' abusive and harassing conduct would have caused any reasonable person of the Jewish religion or heritage to be acutely offended, and to experience severe humiliation, embarrassment, and emotional distress.

83.     As a result of Defendants' unlawful conduct as described above, their abusive and harassing conduct created a hostile and offensive work environment that adversely affected Plaintiff's ability to perform his employment responsibilities and duties, caused his work performance to suffer, resulted in Plaintiff receiving reprimands from Defendants, and it ultimately resulting in Plaintiff's constructive discharge when Plaintiff refused to submit to Defendants' demands.  *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101, 102 (2d Cir. 2006) (harassment culminates in a tangible employment action if the action is "linked" to the harassment); *see also*, *Vance v. Ball*

*State Univ.*, 133 S. Ct. 2434, 2439 (2013), When a supervisor engages in harassment that includes a tangible employment action imposing "a significant change in employment status," such as discharge, demotion, or refusal to promote, the employer is liable and does not have a defense. *Baldwin* at 1303 and *Ferraro* at 102.

84.     Defendant's acts were willful and done with malice or reckless indifference to Plaintiff's federally protected rights.

WHEREFORE, Plaintiff respectfully prays that this Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT TWO
## DISCRIMINATION BASED ON
## THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

85.     Plaintiff realleges each and every matter contained in the previous paragraphs of this Complaint, incorporates them herein and further states and alleges as follows:

86.     The Human Rights Act., D.C. Code § 2-1401.01 prohibits discrimination including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intrafamily offense, and place of residence or business.

87.     Defendants' discriminatory, harassing, and abusive conduct, assaults, attacks and harassment directed at Plaintiff, as described in this Complaint constitute unlawful discrimination against Plaintiff by reason of his national origin within the meaning of the DCHRA.

88.     In interpreting the D.C. Human Rights Act, courts may rely on cases construing Title VII where they use similar words and reflect a similar purpose.   *Benefits Commc'n Corp. v. Klieforth,* 642 A.2d 1299, 1301 (D.C. 1994); *see, e.g., Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 887 (DC Ct of App. 2003)(*en banc*).  The overriding difference is that in enacting the DCHRA,

the Council for the District of Columbia intended to go above and beyond the protections afforded employees by Title VII. *Estanos v. PAHO/WHO-FCU,* 952 A.2d 878 (2008). In fact, Title VII provides employees with a higher bar in proving discrimination than does the DCHRA as practices that are merely questionable under Title VII, may suffice to establish discrimination under the DCHRA. *See* D.C. Code § 2-1401.01 et seq. As an example, unlike Title VII, which has a broadly defined business justification exception, the DCHRA contains no exception that explicitly permits outright discrimination on the basis of national origin in employment, and it specifically excludes preferences of coworkers, employees, customers or any other person as justification for business necessity. *Id.*

89.     The DCHRA prohibits employers from discriminating against individuals based on their national origin in hiring, firing or any other terms and conditions of employment. DC Code § 2-1402.11.

90.     Plaintiff need not prove that his national origin was the only factor in Defendants' negative employment decisions affecting him; instead, he must only prove that it was a motivating factor. 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."); *see Perez v. N.J. Transit Corp.*, 341 F. App'x 757, 761-62 (3d Cir. 2009)

91.     These protections extend to foreign nationals working in the United States. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (holding "Tit[le] VII protects all individuals from unlawful discrimination, whether or not they are citizens of the United States."). They also apply to foreign companies doing business in the United States. *See, e.g., Ward v. W & H Voortman, Ltd.*, 685 F. Supp. 231, 233 (M.D. Ala. 1988) ("[A]ny company, foreign or domestic, that elects to do business in this country falls within Title VII's reach."); *see also Morelli v. Cedel,* 141 F.3d 39, 44

(2d Cir. 1998) (noting that American laws prohibiting employment discrimination would apply to a foreign employer's operations in the United States).

92.     Plaintiff worked for Defendant Cochrane USA continuously starting in 2010.

## DISPARATE TREATMENT

93.     During Plaintiff's entire period of employment, Defendants deprived Plaintiff of benefits and beneficial terms and conditions of employment that they provided to their similarly situated American employees.  These include the following: 1) an employment contract; 2) health insurance; 3) retirement plans; 4) training; 5) the ability to file Workers' Compensation claims; 6) a company vehicle; 7) paid vacations; 8) equal wages; and 9) to be free of harassment and intimidation for seeking equal benefits.

94.     When Plaintiff successfully sold $15 Million worth of products to U.S. based utilities, Defendants transferred the business and the territory to an American salesman. When they did this they admitted that the reason for the move was because Plaintiff was not an American citizen, something obviously not justified for business reasons.

95.     Defendant's discriminatory treatment of Plaintiff, including denying him benefits and refusing to increase his pay, paying him unequal compensation, taking away assignments and sales territory from Plaintiff and subjecting him to the above-described abusive and harassing conduct was because Plaintiff was a foreign national and a citizen of Israel and South Africa.

96.     Defendants' discriminatory acts were willful and done with malice or reckless indifference to Plaintiff's federally protected rights.

## HOSTILE WORK ENVIRONMENT

97.     Title VII of the Civil Rights Act of 1964 also prohibits national origin harassment of employees where it is so frequent or severe that it creates a hostile or offensive work environment. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (holding that Title VII is violated "[w]hen

the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'") (*quoting Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-67 (1986)); *EEOC v. WC&M Enters.*, 496 F.3d 393, 400 (5th Cir. 2007) (finding that the EEOC presented sufficient evidence to create an issue of fact as to whether the employee was subjected to national origin harassment that was "so severe or pervasive as to alter a condition of his employment").  *See e.g. Thong v. Andre Chreky Salon*, 634 F. Supp. 2d 40 (D.DC 2009)(as an example of a hostile work environment claim under the DCHRA); *see also Lyles V. District of Columbia*, 17 F. Supp. 3d 59, **15-16 (D.DC 2014)("Sexual harassment creates a hostile environment only if it is so 'severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Taylor v. Solis,* 571 F.3d 1313, 1318, 387 U.S. App. D.C. 230 (D.C. Cir. 2009) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). As the Supreme Court has explained, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive . . . ." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). In determining whether a hostile environment exists, courts "look[] to the totality of the circumstances, including the frequency of  [**16] the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne,* 550 F.3d 1191, 1201, 384 U.S. App. D.C. 85 (D.C. Cir. 2008).

98.     In January 2016, Mr. Filiba was seriously injured while working at Defendants' warehouse in Virginia. He incurred significant medical expenses and his injuries prevented him from traveling for a period of time, thus affecting his ability to effectively perform many of his duties.

99.     Because Plaintiff was not an American citizen, Plaintiff was not afforded health insurance or an automobile by Defendants, so Plaintiff requested Defendants' financial assistance with his medical expenses associated with his work-related injuries and with his car payment while he was incapacitated. Defendant cursed at Plaintiff, threatened him with termination and summarily refused Plaintiff's request.

100.    In or around May, 2016, Plaintiff ultimately filed a claim for Worker's Compensation.

101.    In response, Defendant Lex Cochrane ordered Plaintiff to withdraw his Workers' Compensation claim, and, when Plaintiff refused, Defendants began a vicious campaign against Plaintiff in which they outrageously harassed and attacked him for asserting his lawful rights.

102.    Defendants victimized Plaintiff by unlawfully hacking and deleting the entire contents of his private cell phone using "Cochrane+" an in-house application.  This restored the phone's factory settings.

103.    Defendants also used Cochrane+ to unlawfully track Plaintiff's every movement 24 hours a day, using a GPS device that they surreptitiously planted on Plaintiff's personal cell phone.

104.    On September 6, 2017, Defendants continued their assault on Plaintiff, maliciously deleting his user profile, which prevented Plaintiff from accessing the company email and CRM server thus preventing him from effectively performing his duties.

105.    Defendants refused to restore Plaintiff's email and computer profile for several weeks, despite Plaintiff's repeated requests and despite the fact that Plaintiff's ability to work was severely damaged.

106.     In September 2017, Defendant Lex Cochrane informed Plaintiff that the USDOL had held up his employment-based Green Card application because Defendants were underpaying Plaintiff by a whopping 150%.

24

107.    At the time that Defendant Lex Cochrane informed Plaintiff of the DOL's adverse action, Defendant laughed at Plaintiff and ridiculed him stating words to the effect that Plaintiff would never be free of Defendants and would never gain his independence from Defendants. Essentially, Plaintiff would be indefinitely enslaved and indentured to Defendants because he was a foreign national.

108.    As Plaintiff's employer sponsor, the USDOL provided Defendants, with the official documentation relating to its adverse adjudication of Plaintiff's application.

109.    When Plaintiff asked to see the USDOL documentation relating to its adverse adjudication, Defendants refused.

110.    Defendants' discriminatory treatment of Plaintiff impacted every aspect of Plaintiff's terms and conditions of employment. It was also objectively severe and outrageous. *See, e.g. EEOC v. Global Horizons, Inc.*, 7 F. Supp. 3d 1053 (D. Haw. 2014) (Title VII case finding contractor liable where Thai nationals brought to the U.S. under the H-2A visa program were paid less than non-Thai workers, and subjected to abuses, including physical violence, humiliation, heavy surveillance, and threats of being shot, deported, or arrested).

111.    Defendants' discriminatory treatment of Plaintiff was offensive to Plaintiff, was objectively offensive and coercive, and it caused him to experience financial damages including, reduced compensation, financial hardship, severe humiliation, embarrassment and significant emotional distress.

112.    Defendants' discriminatory treatment of Plaintiff and its other non-citizen employees, including denying benefits, providing unequal compensation, and subjecting non-Christian employees to abusive and harassing conduct would have caused any reasonable person similarly treated to feel that their work environment was hostile.

113.    As a result of Defendants' unlawful conduct as described above, Defendants created

a hostile and offensive work environment for Plaintiff, and it adversely affected his ability to perform his employment responsibilities and duties, causing his performance to suffer, and causing Plaintiff financial harm. *See Morgan*, 536 U.S. at 116 (Title VII is violated where a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult'" that is sufficiently severe or pervasive to create an abusive working environment); id. at 120 (in course of affirming the Ninth Circuit's determination that Morgan's hostile work environment claim could include incidents that occurred outside the filing period, the Court noted evidence of racial jokes, negative comments about black supervisors, and racial epithets).

114.    Defendant's discriminatory acts were willful and done with malice or reckless indifference to Plaintiff's federally protected rights.

115.    Defendants' discriminatory, harassing, and abusive conduct, assaults, attacks and harassment directed at Plaintiff as described in this Complaint and more specifically in  Count One above,  constitutes unlawful discrimination against Plaintiff by reason of his  religion within the meaning of the DCHRA.

116.    Although individuals cannot be held personally liable for damages under Title VII, the DCHRA specifically permits personal liability for violations of the Human Rights Act. D.C. §§ 2.1401.01 *et seq*.

WHEREFORE, Plaintiff respectfully prays that this Court grant the relief set forth hereinafter in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Honorable Court award him:

(a) Compensatory damages in the form of retroactive back pay, benefits and other emoluments of employment and for damage to his credit rating starting from January 2010;

(b) Compensatory damages for Plaintiff's emotional distress suffered because of the

discrimination, harassment and the Defendants' creation of a hostile work environment for Plaintiff;

(c) Damages including the cost of COBRA benefits and front pay at the pay level (including pay increases granted to American Citizen similarly positioned employees of Defendant) until Plaintiff is able to earn the income he would have received if he had not been discriminated against or until he reaches the age of 65 years when he would have retired;

(d) Punitive damages as permitted under Title VII.

(e) All permissible damages, without limitation as provided under the DCHRA, including, but not limited to compensatory damages, punitive damages, pre and post-judgment interest, and attorneys' fees.

(f) The imposition civil penalties on Defendants pursuant to the DCHRA of not less than $10,000 and not more than $50,000;

(g) Costs and reasonable attorneys' fees incurred with this lawsuit with interest thereon; and

(h) Other damages and further relief as deemed just.


## JURY DEMAND

The Plaintiff requests trial by jury.


Respectfully Submitted,

/S/ *Claudette V. Ferron*
Claudette V. Ferron, Esquire.
(D.C. Bar No. 383351)
1300 Pennsylvania Ave, NW.,
Suite 700
Washington, D.C. 20004
Tel: (340) 690-3262
Attorney for Plaintiff